# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 20-0917V

JAMES KINCAID,

                Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

                Respondent.

Chief Special Master Corcoran

Filed: December 17, 2025

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*James Vincent Lopez, U.S. Department of Justice, Washington, DC, for Respondent.*

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

On July 29, 2020, James Kincaid filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a right shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, or in the alternative a caused-in-fact injury, after receiving a tetanus, diphtheria, acellular pertussis ("Tdap") vaccine on November 7, 2017. Petition at 1, ¶¶ 1, 11.

---

[1] Because this Fact Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at  https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons set forth below, a preponderance of the evidence supports the conclusion that Petitioner's pain onset likely occurred within 48 hours of vaccination, but there exists a viable alternative cause that would explain his symptoms – meaning Petitioner cannot establish a Table SIRVA.[3] This case may still be tenable, however (although I urge the parties to attempt settlement a final time before the matter is transferred from the "Special Processing Unit" ("SPU")).

## I.      Relevant Procedural History

Approximately two months after the Petition's filing, Mr. Kincaid provided the sworn declaration[4] and medical records required by the Vaccine Act. Exs. 1-14, filed Oct. 9, 2020, ECF No. 7. On October 29, 2020, the case was activated and assigned to the SPU (OSM's adjudicatory system for resolution of cases deemed likely to settle). ECF No. 9.

Over the subsequent seven months, the parties attempted to reach an informal settlement. *See,* e.g.*,* Status Report, filed Feb. 28, 2022, ECF No. 27. And Petitioner filed updated medical records on several occasions. Exs. 15-16, filed Jan. 12, 2021, ECF No. 13; Exs. 17-18, filed Feb. 28, 2022, ECF No. 26; Ex. 19, filed Mar. 31, 2022, ECF No. 28. On May 31, 2022, Petitioner informed me that the parties had reached an impasse in their settlement discussions. ECF No. 32.

On September 9, 2022, Respondent filed his Rule 4(c) Report, setting forth his objections to compensation. ECF No. 33. Emphasizing an intervening podiatry appointment with no mention of shoulder symptoms and eight-week delay before seeking treatment, Respondent argues that Petitioner has failed to establish pain onset within 48 hours of vaccination. *Id.* at 8-9. He also maintains that "Petitioner's right shoulder injury more likely than not arose from this work-place accident, rather than from his receipt of the Tdap vaccine." *Id.* at 10 (citing Ex. 6 at 30; Ex. 7 at 200; Ex. 8 at 51). Respondent discounts the conclusion of the immunologist (who first treated Petitioner more than two years post-vaccination) that Petitioner's injury was vaccine caused, noting that the treating physician was unaware of medical record entries showing Petitioner suffered injury to his right shoulder, as well as hand, during a workplace accident. Rule 4(c) Report at 9-10.

---

[3] 42 C.F.R. § 100.3(c)(10)(ii) & (iv) (2017) (the second and fourth criteria listed in the Qualifications and Aids to Interpretation ("QAI") related to pain onset and a viable alternative cause).

[4] The declaration was signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Ex. 13.

Thereafter, I ordered entitlement briefing, clarifying in response to Petitioner's request for an expert that I intended to address only his Table SIRVA claim.[5] On October 6, 2023, Petitioner filed updated medical records and sworn declarations[6] from his spouse, a co-worker, and himself. Exs. 20-27, ECF No. 37. Over the subsequent three months, the parties completed their briefing. ECF Nos. 38-39, 44.

## II.    The Parties' Arguments

At issue is whether Petitioner suffered pain onset within 48 hours of vaccination, and whether there is an alternative cause that would explain her symptoms - specified elements defined in the QAI pertinent to a Table SIRVA. 42 C.F.R. § 100.3(c)(10)(ii) & (iv). For his Table claim to succeed, Petitioner must provide the preponderant evidence needed to satisfy these requirements.

Emphasizing the consistent histories contained in medical records, as well as sworn declarations from his wife and himself, Petitioner maintains he has provided preponderant evidence showing pain onset within 48 hours – specifically, the morning after vaccination. Petitioner's Brief Regarding Entitlement ("Brief"), filed Nov. 6, 2023, at 15-18, ECF No. 39. Regarding his failure to mention his shoulder pain during an intervening appointment with his podiatrist, he states, "[i]t is unclear why [R]espondent believes [he] was obligate to report his shoulder pain to his foot doctor." Id. at 15. Characterizing the medical record entries attributing his shoulder pain to the work-place accident as "three stray citations" (Brief at 19), Petitioner insists that the preponderant evidence - including a sworn declaration from a co-worker, the MRI results, and the slightly delayed pain onset (the morning after the accident and vaccination), favors a causal link with the Tdap vaccine. Id. at 18-23. To support his assertion that the sworn declarations in this case are "entitled to great weight" (id. at 21), Petitioner emphasizes similarities with the medical records and the first-hand knowledge of the declarants. Id. at 16-17, 19-21.

In response, Respondent insists that the later-provided evidence (such as the sworn declarations and medical records from treatment several years post-vaccination) is not sufficient to counter the information contained in more contemporaneously-created documents. Response to Petitioner's Motion for a Factual Ruling ("Opp."), filed Dec. 19, 2023, at 1-5, ECF No. 42. He contends that "there are no contemporaneous records to validate" Petitioner's later claims, such as his assertion that he suffered severe shoulder pain and "went to the nurses' station every day." Id. at 3 (citing Ex. 25 at ¶¶ 3-5); see also

---

[5] As explained during a call and in my orders, the parties will be allowed to retain an expert before causation is addressed. See Minute Entry, dated Aug. 28, 2023; ECF Nos. 34-36.

[6] These declarations were signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Exs. 25-27.

Opp. at 4 (citing Ex. 26 at ¶ 4 - Ms. Kincaid's assertion that Petitioner "'woke up screaming in pain' the morning of November 8, 2017"). Noting that his podiatrist's practice is located in the same clinic where Petitioner received orthopedic care, Respondent maintains that "it is incomprehensible that [P]etitioner was in an orthopedic office on December 13, 2017, with a shoulder 'paralyzed with pain' but chose to say nothing to the medical professional in front of him." *Id.* at 5 (citing Ex. 6 at 33; Ex. 25 at ¶ 3).

On January 23, 2024, Petitioner filed his reply, again insisting that the "onset of SIRVA occurred within 48 hours, his right shoulder injury was a direct result of his Tdap vaccination, and [he] is entitled to vaccine compensation." Petitioner's Reply to Opp. to Brief at 7, ECF No. 44. He reasons that "[h]ad [he] severely injured his right shoulder at the time of the workplace accident, as [R]espondent alleges, he would not have been able to perform his duties immediately after the incident and it is unlikely that he would have been unable to exit the lift unassisted." *Id.* at 3. He characterizes as speculative Respondent's argument that he should have mentioned his shoulder pain to his podiatrist. *Id.* at 5.

### III.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the

patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### IV.    Findings of Fact

I make these findings related to onset and a viable alternative cause after a complete review of the record, including all medical records, affidavits or declarations, and additional evidence filed. Specifically, I highlight the following evidence:

- Prior to vaccination, Petitioner suffered from midline lower back, neck, right sciatic, and right hip pain. Ex. 2 (primary care provider ("PCP") records from Dublin Family Medicine). X-rays of his neck and lower back taken in July 2017, revealed mild disc space narrowing and mild to moderate degenerative changes.[7] Ex. 2 at 3-6. After gaining no improvement from physical therapy ("PT"), Petitioner was prescribed Meloxicam for his arthritic pain. *Id.* at 18, 20. When undergoing a colonoscopy in mid-August 2017, Petitioner reported neck and right hip pain and was noted to suffer from arthritis and obesity. Ex. 7 at 95.

- In a post-vaccination record (on February 27, 2018), when diagnosed with "mild right carpal tunnel and right ulnar neuropathy," it was noted that Petitioner "had two previous carpal tunnel releases on the right as well as ulnar nerve release on the right." Ex. 8 at 166.

- On November 7, 2017, Petitioner (age 62) experienced a workplace accident and went to the local emergency room ("ER") that evening for a laceration in his right hand. Ex. 7 at 123-31. He received sutures and was given a Tdap vaccine in the right deltoid. *Id.* at 129.

- Approximately one-month post-vaccination, on December 13, 2017, Petitioner was seen by an orthopedist for a complaint of left foot and arch pain for the past six months. Ex. 6 at 33. Diagnosed with left foot osteoarthritis, he received counseling regarding the history of degenerative joint disease of the foot and instructed to return if the pain continued and worsened. *Id.* at 34. There is no mention of any left *shoulder* pain in the record from this visit.

---

[7] Specifically, cervical spine x-rays revealed "mild disc space narrowing at C5-6 and C6-7 . . . [and] mild bilateral uncinate hypertrophy which is contributing to mild bony foraminal stenosis." Ex. 2 at 3. Lumbar spine x-rays revealed "mild disc narrowing throughout . . . [and] moderate degenerative change in the facet joints." *Id.* at 5. The results of x-rays of Petitioner's hips taken the same day were unremarkable. *Id.* at 7.

- On January 5, 2018 (barely two months post-vaccination), Petitioner saw his employer's company physician for right arm pain. Ex. 8 at 165.[8] He reported that he had suffered a laceration on November 7, 2017, had received a tetanus shot at that time to his right deltoid, and had pain in that vicinity since then which had intensified some and is provoked by sleeping on his side. *Id.* He further described his pain as "a dull ache deep in the arm at times," sometimes radiating distally and up into his shoulder. *Id.*

- During the physical examination, the company physician observed "no tenderness to palpitation" and good strength and range of motion ("ROM"), but pain with internal abduction. Ex. 8 at 165. He expressed a general skepticism about a causal relationship between this type of pain and vaccination, heightened in this case due to the lack of the "tenderness at the site where the nerve [wa]s transected." *Id.* Rather, he theorized that Petitioner may have experienced a pinched nerve in the neck due to his position when vaccinated or a "rotator cuff injury, which [would be] temporally related but not causally related." *Id.* To help determine the cause of Petitioner's symptoms, he recommended a nerve conduction or EMG[9] study. *Id.*

- On January 28, 2018, Petitioner returned to the emergency department for right shoulder pain. Ex. 7 at 173. He informed the ER doctor that his pain had existed since his Tdap shot on "November 19." *Id.* Petitioner exhibited good range of motion, but pain with lifting and extending. *Id.* The ER doctor concluded that his "shoulder pain [wa]s due to tendinitis, bursitis, or an injury to the tendons that surround the joint (the rotator cuff)." *Id.* at 184. He was given a sling and referred to orthopedics. *Id.*

- Performed on February 15, 2018, the EMG revealed "[m]ild right carpal tunnel syndrome, [r]ight ulnar neuropathy across the elbow . . . [and] EMG right upper extremity consistent with # 2" (the right ulnar neuropathy). Ex. 12 at 2.

- Petitioner had a second appointment with the company physician on February 27, 2018. Ex. 8 at 166. Noting that Petitioner had undergone prior

---

[8] I am citing the most legible copy of this record which can be found in Petitioner's workers' compensation claim. However, these records also were filed in a separate exhibit for the provider as Exhibit 9. *Compare* Ex. 8 at 165 *with* Ex. 9 at 3. Although the record originally referenced right *eye* pain and listed Petitioner as *Jimmy* Kincaid, an addendum clarified that his complaint was right *arm* pain and his name is *James* Kincaid. Ex. 8 at 165; Ex. 9 at 3.

[9] EMG stands for electromyograph. Medical Abbreviations at 207 (16th ed. 2020).

carpal tunnel and ulnar nerve releases on the right side, the physician discussed the results of Petitioner's recent NCS/EMG, which showed "mild right carpal tunnel and right ulnar neuropathy but no other signs of cervical root disease." *Id.* The company physician also noted that Petitioner "had a tetanus shot in the right deltoid region and that was presumed the cause of the arm pain but this far out [it] would not be reasonable to expect [the injection] to explain the symptoms." *Id.* Upon examination, the company physician observed a knot but "no palpable tenderness or symptoms in the area of pain." Ex. 8 at 166. Opining that "[c]arpal tunnel could explain the pain in a referred fashion," but a rotator cuff tear also must be considered, he prescribed Neurontin and ordered an MRI. *Id.*

- The MRI (performed on March 19, 2018) revealed "[s]upraspinatus, infraspinatus, biceps and subscapularis tendinopathy, [f]ull-thickness tear of the supraspinatus, [and] [p]artial tearing of the infraspinatus with full-thickness tear not excluded." Ex. 3 at 11.

- On March 26, 2018, Petitioner saw an orthopedist for right shoulder pain that "occurred in the context of an injury at work on 11/17/2017, . . . described as dull and aching and associated with difficulty sleeping, hand numbness, arm weakness, hand tingling, stiffness, neck pain, and worse with overhead activity." Ex. 6 at 30. Petitioner reported that he "was taking a valve off a power unit and he tried to push on it. When it broke loose, he slammed agains [sic] the machine and injured his hand and also his shoulder." *Id.* He estimated his current pain at two out of ten, adding that it could be as high as eight on a "bad day." *Id.* It was noted that Petitioner "was also seen for his wrist" and had been told he had carpal tunnel syndrome after EMG studies. *Id.*

- Observing pain, weakness, and reduced range of motion ("ROM") upon examination and noting the results of the recently performed EMG and MRI, the orthopedist discussed treatment options – specifically PT and arthroscopic surgery. Ex. 6 at 30-31. He recorded Petitioner's choice to undergo arthroscopic surgery, specifically rotator cuff repair, subacromial decompression, and biceps tenodesis. *Id.* at 31.

- Performed on May 1, 2018, the arthroscopic surgery consisted of a biceps tenodesis, limited debridement of the partial cuff tear, and subacromial decompression. Ex. 4 at 44. Postoperative diagnoses were as follows:

1. Grade 4 SLAP[10] tear with extension into the biceps with tendinosis,
2. Partial cuff tear, just less than 50% anterior supraspinatus, [and]
3. Signs of rotator cuff impingement.

*Id.*

- At his initial post-surgical PT session on May 7, 2018, Petitioner recounted that "he injured his shoulder while loosening a hydraulic hose at work and ended up jerking his shoulder." Ex. 7 at 200. Reporting that he "has been in a sling since" his May 1, 2018 surgery, he described sharp and radiating pain that was "worse in the morning when waking up," at a level of three at rest and five with activity. *Id.*

- During PT recertification on July 9, 2018, following 27 sessions, Petitioner stated that he "fe[lt] like [he was] "50% of where [he] need[ed] to be, the pain [wa]s still there, I fe[lt] like I was able to do more stuff before the surgery than after the surgery." Ex. 7 at 273. And he provided the same pain levels, three at rest and five with activity. *Id.* Assessing Petitioner as at least 60 percent but less than 80 percent impaired, the therapist recommended three times weekly PT for an additional four weeks. *Id.* at 274.

- The next day (July 10, 2018), Petitioner visited his orthopedist for a post-op checkup. Ex. 6 at 16. Stating that he was not taking any pain medication, Petitioner described intermittent, sharp, and aching pain throughout the day, at a severity of four but worse with activity. Ex. 6 at 16. He also reported "trouble with range of motion, . . . stat[ing] that it takes approximately 1 hour to get going in the morning [and] has pain in the bicep as well." *Id.* The orthopedist instructed Petitioner to continue his PT and work restrictions and to follow-up in four weeks. *Id.*

- On July 26, 2018, Petitioner filed a worker's compensation claim for injury to his right shoulder. Ex. 8 at 51. In response to the prompt "[h]ow injury occurred," Petitioner wrote, "I was taking a tight hydraulic line off and when it broke free, I put 12 stitches in my hand and injured my [r]ight shoulder." *Id.* The date of the injury was listed as "11-07-17." *Id.*

---

[10] SLAP stands for superior labral anteroposterior. MEDICAL ABBREVIATIONS at 552.

- Petitioner underwent another MRI on August 10, 2018, which revealed "[p]artial articular surface tears of the supraspinatus, infraspinatus, and subscapularis tendons with tendinosis, [d]egenerative signal in glenoid labrum with a type II SLAP tear, [p]ostsurgical changes related to a biceps tenodesis, [o]steoarthritis of the acromioclavicular joint, [and] [m]ild subacromial/ subdeltoid bursitis." Ex. 3 at 22.

- On August 13, 2018, Petitioner returned to the orthopedist for follow-up and discussion of his MRI results. Ex. 6 at 11. Estimating his pain level as two out of ten, Petitioner described "radiating pain down into his arm and hand" and stiffness in the right shoulder. *Id.* The orthopedist observed no progression of the rotator cuff tearing and significant tenderness "over the biceps groove at [the] tenodesis sight [sic]." *Id.* at 12. He diagnosed Petitioner with bicipital tendinitis "distributed on the right biceps brachii[11] (long head)" and administered a steroid injection. *Id.*

- On August 26, 2018, Petitioner returned to the orthopedist, complaining of continued "biceps pain and wrist and hand numbness and tingling" that prevent him from performing his work and daily activities. Ex. 6 at 9. Estimating his pain level as three out of ten, he described numbness, tingling, and constant and aching pain. Petitioner added that he had been diagnosed with carpal tunnel syndrome and cubital tunnel syndrome after his earlier EMG. *Id.* In response, the orthopedist ordered another EMG.[12] Ex. 6 at 10.

- Petitioner was discharged from PT on September 13, 2018, after completing 47 sessions from May through September 2018. Ex. 7 at 14. At that time, he reported "continual pain of 2-3/10 in the lateral shoulder region despite being over 4 months [past] RTC surgery." Noting that Petitioner continued to demonstrate very intermittent improvements in his shoulder ROM, strength, and functional tolerance to exercise, the therapist recorded that Petitioner "'thinks the reason for his shoulder . . . still hurting is d/t a tetanus shot that caused increased paralysis of the shoulder which then subsided over the next couple of days." *Id.*

---

[11] Biceps brachii is the biceps muscle of the arm as contrasted with the biceps femoris which is the "biceps muscle of the thigh." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 1203 (32th ed. 2012).

[12] Petitioner *may* also have received another steroid injection as the record lists that procedure as the agreed upon plan. Ex. 3 at 10. However, that entry bears a striking resemblance to the entry found in the medical record from the previous visit (on August 13, 2018) when a steroid injection was clearly administered. Thus, this later entry may be simply a carryover of information from that earlier visit. *Compare* Ex. 3 at 10 *with id.* at 12.

- Upon examination, the therapist recorded that Petitioner demonstrated decreased ROM but no signs of weakness. Ex. 7 at 14. Although Petitioner had met three of the four PT goals (*id.*), the therapist discussed the reasons for Petitioner's ongoing pain, concluding that "at this time, therapy is not the best course of action and [Petitioner] needs to be referred back for further testing to reassess his shoulder pain" (*id.* at 15).

- On September 14, 2018, Petitioner received a workers' compensation award consisting of "$1,043.00 . . . per week during temporary total disability beginning May 01, 2018," and medical benefits "for reasonable, necessary, and authorized medical treatment for the following body parts injured during the . . . workplace injury of November 7, 2017: [r]ight hand laceration." Ex. 8 at 20.

- At his next orthopedic visit on October 15, 2018, Petitioner again reported aching right shoulder pain that worsened with activity – this time at a level of four. Ex. 6 at 6. Noting that the second EMG revealed only findings related to cubital tunnel syndrome, the orthopedist administered a second[13] cortisone injection. Ex. 6 at 6-7. The orthopedist added that Petitioner claims that he "had no shoulder pain after injury or weakness, all occurred after tetanus shot, the next day his [sic] was paralyzed."

- When Petitioner returned to the orthopedist on December 13, 2018, he continued to report unchanged symptoms – constant pain (although now three out of ten) and limited ROM that prevented him from driving with his right arm and putting on his safety harness. Ex. 6 at 4. Because Petitioner believed the tetanus shot was "his issue," the orthopedist recommended that he pursue treatment from an immunologist. *Id.* at 5.

- On October 16, 2019, Petitioner saw an allergist and immunologist for treatment of "chronic pain since [vaccination]." Ex. 10 at 11. Informing the immunologist that he had performed research believing he suffered a SIRVA, "has filed a vaccine injury claim, and would like a copy of his records to be sent to his attorney, Petitioner described the injury to his right hand when putting on a control valve and the stitches and Tdap vaccine he received at the hospital. *Id.* Estimating his pain severity from two to five (*id.*

---

[13] Although it is likely this injection was Petitioner's second, there is some evidence showing he *may* have received a steroid injection on August 26, 2018. *See supra* note 12.

at 12), Petitioner stated that "[i]t can flare like crazy for a few days" (*id.* at 12).

- The immunologist "agree[d] with Petitioner's conclusion that he ha[d] a SIRVA injury post vaccination" (Ex. 10 at 15) but noted that he had not reviewed any prior records related to Petitioner's injury (*id.* at 11). He recommended that Petitioner see a pain management specialist and use pain relief options such as hot patches. *Id.* at 15.

- On January 23, 2020, Petitioner visited a different orthopedist at the Cleveland Clinic for a second opinion. Ex. 16 at 27-30. He recounted the injury to his right hand only, the stitches and Tdap vaccine at the ER thereafter, and his later treatment – including the EMG, MRI, arthroscopic surgery, PT, and steroid injections. *Id.* at 27. Petitioner "localize[d] the pain to the biceps area below the pec insertion" and reported that PT helped with movement but not pain. *Id.*

- After performing an examination and reviewing the results of x-rays taken that day and the post-surgical MRI[14] (Ex. 16 at 29), the Cleveland Clinic orthopedist concluded "that the symptoms in [Petitioner's] left shoulder [wa]s due to biceps tendinitis in the remnant of the biceps following Tina Deese this [sic]" (*id.* at 30), likely a reference to the biceps tenodesis performed during surgery, adding that he May 2018 arthroscopic surgery "appear[ed] to have resolved his rotator cuff related pain." *Id.* at 30. Observing that Petitioner "reported significant improvement in his pain and [wa]s able to move his arm more freely after a lidocaine injection at the area of maximum tenderness – the "groove along the remnants of the biceps tendon," the orthopedist recommended opined Petitioner would "benefit from removal of the remember [sic] [of the] end of the long head of the biceps within the groove and a subpectoral biceps tenodesis." *Id.*

- On March 26, 2020, Petitioner returned to his usual orthopedist in Virginia, sharing the Cleveland Clinic orthopedist's recommendation to undergo a second arthroscopic surgery. Ex. 15 at 9. After discussing all options, including additional PT, Petitioner opted for a second surgery – involving a tenodesis and tenotomy.[15] Ex. 15 at 11.

---

[14] Although the orthopedist described this second MRI as being performed in November 2019 (Ex. 6 at 29), this post-surgical MRI was performed on August 10, 2019. *Compare* Ex. 16 at 29 *with* Ex. 3 at 15-27.

[15] Tenodesis is "the stabilization of a joint by anchoring a tendon to the bone," and tenotomy is "the surgical cutting of any tendon." DORLAND'S at 1882.

- Noting that Petitioner "had underwent arthroscopic biceps tenodesis, now believed to possibly be causing his continued pain in the biceps area," the orthopedist performed a second surgery on May 15, 2020. Ex. 15 at 64. As expected, "pretty extensive scarring both kind of below the pec and certainly in the biceps groove" was revealed. *Id.* at 65. After successfully decompressing the biceps, but encountering some difficulty with reattachment, the orthopedist stated that he "felt we had reapproximated most of the muscle-tendon length appropriately without tethering him in extension." *Id.*

- On June 20, 2020, Petitioner signed the first sworn declaration in this case (although it was not filed until October 2020). Ex. 13 at 5. Describing his right-hand injury, he insisted that he had no shoulder pain, returned to work after his ER visit, and woke up with paralyzing pain the next morning, about twelve to fourteen hours after vaccination. *Id.* at ¶ 1. Petitioner stated that he complained of his right shoulder pain at the nurse's station that day and for two weeks thereafter before obtaining an appointment with the company physician in January 2019. *Id.* at ¶¶ 2-3.

- In the declaration, Petitioner recounted that neither the company physician, the treating physician at a later ER visit,[16] nor his orthopedist could provide him with a reason for his pain. Ex. 13 at ¶¶ 4-6. And the company physician and ER doctor both expressed disagreement with Petitioner's belief that his pain was vaccine related. *Id.* at ¶¶ 4-5. Petitioner recalled being forced to convince his orthopedist and then workers' compensation case manager to authorize referrals to an immunologist and the Cleveland Clinic orthopedist who both confirmed his belief that he had suffered a SIRVA.[17] Ex. 13 at ¶¶ 7-11. He also described the difficulties he has endured. *Id.* at ¶¶ 12-21.

- At Petitioner's his first post-surgical appointment on August 5, 2020, the orthopedist noted that Petitioner experienced continued "limitations with overhead activity" (Ex. 6 at 16) but much better "pain by the biceps" (*id.* at 17). He recommended a return to light duty work with limited overhead

---

[16] Besides opining that Petitioner's symptoms could be due to s due to tendinitis or bursitis, the ER physician opined that they could be due to "an injury to the tendons that surround the joint (the rotator cuff)." Ex. 7 at 184.

[17] There is no entry in the medical record from the visit to the Cleveland Clinic orthopedist reflecting his belief that Petitioner's condition was related to the Tdap he received. Ex. 16 at 27-33. The orthopedist opined only that Petitioner's symptoms were due to biceps tendinitis in the remnant of the biceps following Petitioner's arthroscopic surgery. *Id.* at 30.

activities and six weeks of PT "that will have to be authorized through his workers comp claim." *Id.* at 18.

- At his initial post-surgical PT session on August 12, 2020, Petitioner reported that he had not yet returned to work but expected to do so with accommodations for overhead work. Ex. 16 at 73. Upon examination, the therapist observed hesitancy or refusal to use his right arm to reach overhead or lower his arm, despite, "when distracted with arm motion . . . "demonstrat[ing] proper ability and strength needed for both." *Id.* Concluding that Petitioner "[wa]s perfectly capable of using his R arm overhead," the therapist attributed Petitioner's apprehension to "chronic pain prior to surgery for 1-2 years." *Id.*

- At his next orthopedic appointment on September 14, 2020, it was noted that Petitioner had completed PT. Ex. 17 at 4. Petitioner reported pain at a level of one out of ten and continued difficulty with overhead movement at this appointment, as well as the next on September 24, 2020. *Id.* at 4, 7.

- At his last 2020 orthopedic visit (on December 12, 2020), Petitioner reported "doing okay until Wednesday" when he became unable to raise his arm which was "very tender to touch." Ex. 17 at 10. Diagnosing Petitioner with AC arthritis, the orthopedist administered a steroid injection. *Id.* at 11.

- On January 4, 2021, Petitioner returned to the orthopedist, stating that his "pain ha[d] resolved." Ex. 17 at 13. Warning that "the natural history of shoulder arthritis . . . typically has exacerbations and remissions, . . . [t]he shoulder joint does not heal on its own when there is arthritis" . . . [and] [w]ith time, the symptoms of arthritis may get worse," the orthopedist instructed Petitioner to return one year out from surgery (in May 2021) for a functional capacity test. *Id.* at 14.

- When Petitioner returned as instructed (May 20, 2021), the orthopedist designated him as suffering anterior right shoulder impingement syndrome. Ex. 18 at 46. Adding that Petitioner "actually has great strength in the rotator cuff today[and] the severe pain he was having in the biceps groove [wa]s gone . . . [and] [h]is AC joint pain seems to be relieved by his injection," the orthopedist observed that Petitioner's current pain "[wa]s more directly over the hit it [sic] tear subacromial space." *Id.* The orthopedist provided Petitioner with a PT referral for improvement of his scapular motion and dry needling and instructed to return in six weeks. *Id.*

- On three occasions in June 2021, Petitioner sought treatment from a physiatrist[18] at his orthopedic clinic for treatment of right thigh, leg, and lower back pain and numbness. Ex. 18 at 31-45. Reporting that his thigh symptoms had first occurred when he was a teenager (*id.* at 38) and that he had tried PT in 2017, without success (*id.* at 41), Petitioner underwent a spinal injection on June 29, 2021. *Id.* at 32-34. There is no mention of shoulder pain in the records from these visits.

- Returning as instructed for evaluation of right shoulder impingement on July 1, 2021, Petitioner reported "some improvement with therapy, but he does have some continued pain and . . . stiffness." Ex. 18 at 29.

- At his next visit for treatment related to his shoulder (on September 9, 2021), Petitioner described "anterior right shoulder pain," unchanged since last visit and at a pain level of two. Ex. 18 at 11. In two difference entries, his condition is described as a workers' compensation injury. *Id.* at 11-12. Opining that "further surgery would not benefit him, . . . [that he] ha[d] reached maximum medical improvement, . . . [and that] he still fe[lt] he ha[d] . . . limitations in his work duties and [wa]s unable to do things," the orthopedist ordered a FCE[19] "to evaluate [Petitioner] for possible permanent work restrictions." *Id.* at 11.

- On November 11, 2021,[20] Petitioner discussed the results of the FCE, which both he and the orthopedist believed "reasonably show[ed] he [sic] restrictions." Ex. 18 at 4.

- Throughout 2021, Petitioner continued to treat his lower back, thigh, and leg pain with the physiatrist. Ex. 18 at 8-9, 13-27.

- Petitioner also sought additional treatment related to his shoulder symptoms, including another MRI and additional steroid and PRP injections, in 2022 and 2023. Exs. 20-24.

---

[18] Physiatry is "the branch of medicine that deals with the prevention, diagnosis, and treatment of disease or injury, and the rehabilitation from resultant impairments and disabilities, using physical agents such as light, heat, cold, water, electricity, therapeutic exercise, and mechanical apparatus, and sometimes pharmaceutical agents." DORLAND'S at 1443. A physiatrist is "a physician who specializes in physiatry." *Id.*

[19] FCE stands for functional capacity evaluation. MEDICAL ABBREVIATIONS at 224.

[20] Petitioner visited the orthopedist earlier, on November 4, 2021, but was unable to review the results of the FCE he had undergone, because the report had not yet been received by his orthopedist. Ex. 18 at 6.

- In his supplemental declaration, signed on November 4, 2023, Petitioner reiterated his earlier statements, sometimes providing additional information. *E.g.,* Ex. 25 at ¶ 1 (adding that he returned to work after his workplace injury and visit to the ER around 6:00pm to complete his shift). Regarding his second surgery, performed on May 2019, he stated that workers' compensation would only reimburse those costs if the surgery was performed by the orthopedist in Virginia who performed the first surgery, rather than the Cleveland Clinic orthopedist. *Id.* at ¶ 9. Petitioner described his later treatment in more detail (*id.* at ¶¶ 10-12) and again described the difficulties presented by his right shoulder sequela (*id.* at 12-23).

- In her declaration, signed on October 4, 2023, Petitioner's wife also recounted Petitioner waking on November 8, 2017, "screaming in pain" with a "useless" right arm. Ex. 26 at ¶ 4. She also recalled extensive treatment and the significant effect of Petitioner's right shoulder sequela. *Id.* at ¶¶ 2-3, 5-7.

- In his declaration, signed on October 6, 2023, Petitioner's co-worker stated that Petitioner's right shoulder injury continues to bother him. Ex. 27 at ¶ 2. Although he did not see the November 7, 2017 accident, he recalled Petitioner screaming and cussing, stating that he had hurt his hand, going to the nurse's station, and returning several hours later stating he had received stitches in his hand. *Id.* at ¶ 1.

### A.    *Pain Onset*

The record as a whole supports Petitioner's description of right shoulder pain as likely beginning within 48 hours of vaccination – specifically the morning after his November 7, 2017 workplace accident and vaccination. The only evidence which purports a later pain onset is derived from his failure to mention any shoulder symptoms at his December 2017 visit to his podiatrist. As I have stated previously, however, it is not unreasonable for a petitioner to omit any mention of potentially vaccine-related symptoms when attending an already-scheduled visit with a specialist in an unrelated field. Thus, this omission has little probative value, even though the podiatrist is in the same clinic as Petitioner's orthopedist – a fact that Respondent has emphasized (Opp. at 5).

Furthermore, if Petitioner's recollection - that his pain began the day after his accident and vaccination - and his belief (that his symptoms were related to those events) were true, he would be more likely inclined to seek treatment first from work-related medical providers, which he did. *See* Ex. 8 at 165. Petitioner would be unlikely, by

contrast, to seek treatment from another provider, especially one in an unrelated field such as his podiatrist.

When he did seek treatment, Petitioner consistently attributed his shoulder pain to either the flu vaccine or workplace injury, stating that he experienced pain since those events. Ex. 8 at 165; Ex. 7 at 173; Ex. 6 at 30 (in chronologic order). While these entries were based upon information provided by Petitioner, they still should be afforded greater weight than more current representations, as they were uttered contemporaneously with Petitioner's injury for the purposes of obtaining medical care. The Federal Circuit has stated that "[m]edical records, in general, warrant consideration as trustworthy evidence . . . [as they] contain information supplied <u>to</u> or by health professionals to facilitate diagnosis and treatment of medical conditions." *Cucuras*, 993 F.2d at 1528 (emphasis added). Information provided by Petitioner to a treater and contained in a contemporaneous record deserves weight, and should not be considered subjective merely because it *came* from a patient, rather than physician.

Although witness statements from Petitioner and his wife[21] acknowledge that his pain was not *immediate*, but rather began the next morning, a claimant need only demonstrate the onset of pain *within 48 hours* of vaccination. Accordingly, I find the preponderant evidence supports a pain onset within the time frame required for a Table SIRVA – within 48 hours post-vaccination.

### B.    *Alternative Cause*

The record as it currently stands does not support an additional Table element - specifically that related to the lack of a viable alternative cause. *See* 42 C.F.R. § 100.3(c)(10)(v). Although he initially attributed his right shoulder pain to the Tdap vaccine he received, on multiple occasions thereafter Petitioner described an injury to his right shoulder, sustained *at the same time* as his right-hand laceration.[22] Additionally, the first MRI (performed in March 2018) showed a full thickness tear of the supraspinatus tendon and partial thickness tear of the infraspinatus tendon. Ex. 3 at 11. And the post-surgical assessment from his initial arthroscopic surgery in May 2019, included a grade 4 SLAP

---

[21] In all sworn declarations, Petitioner and his wife described him waking up in pain on the morning of November 8, 2017. Ex. 13 at ¶ 1; Ex. 25 at ¶¶ 2-3; Ex. 26 at ¶ 4.

[22] When first seeing an orthopedist in March 2018, less than five months post-vaccination, Petitioner reported slamming against a machine, injuring both his right hand and shoulder, when the valve broke loose. Ex. 6 at 30. At his initial post-surgical PT session in May 2018, he stated that he jerked his right shoulder when attempting to loosen a hydraulic line. Ex. 7 at 200. And when submitting a workers' compensation claim, Petitioner stated that he injured his right shoulder when releasing a tight hydraulic line on November 7, 2017. Ex. 8 at 51.

tear and partial cuff tear slightly less than 50 percent of the anterior supraspinatus tendon. Ex. 4 at 44.

Although these entries *may* not be sufficient to prevent Petitioner from establishing causation, they do preclude him from satisfying this Table requirement. A petitioner will fail to satisfy the fourth QAI criteria if there is preponderant evidence of a condition that *would* explain the petitioner's current symptoms. *See* 42 C.F.R. § 100.3(c)(10)(iv). The condition or abnormality must qualify as an explanation for the symptoms a petitioner is experiencing, but need not be a better or more likely explanation. *Durham v. Sec'y of Health & Hum Servs.,* No. 17-1899V, 2023 WL 3196229, at *13-14 (Fed. Cl. Spec. Mstr. Apr. 7, 2023). In effect, and although the same preponderant evidentiary burden applies to this QAI as with all others, this Table element does not impose on Respondent the obligation to prove an "alternative cause" for the injury, but instead merely requires him to demonstrate that the record contains sufficient evidence of a competing explanation to "muddy" a fact finding that vaccine administration was the cause.[23] The relevant inquiry is whether the condition or abnormality "wholly explains [a petitioner's] symptoms independent of vaccination." *Lang v. Sec'y of Health & Hum. Servs.,* No. 17-0995V, 2020 WL 7873272, at *13 (Fed. Cl. Spec. Mstr. Dec. 11, 2020). This is consistent generally with the precepts of a Table claim, in which the Government presumes causation (and hence waives objections to it) *if* all fact elements are met.

In this case, I find that the evidence of rotator cuff tears that could be linked to the November 7, 2017 workplace accident is sufficient to constitute a viable alternative cause. Thus, the inquiry is answered in the affirmative, and Petitioner cannot satisfy the fourth QAI criterion. Thus, Petitioner's Table claim is DISMISSED.

## V.    Potential for Off-Table Claim

A petitioner's failure to establish a Table injury does not necessarily constitute the end of a case under all circumstances, because he might well be able to establish a non-Table claim for either causation-in-fact or significant aggravation. *See Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274 (Fed. Cir. 2005); *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1357 (Fed. Cir. 2013) (citing *Loving v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 135, 144 (2009)). Here, Petitioner *may* successfully prove causation, but the record is currently lacking on this point.

---

[23] Of course, claims that are styled as a SIRVA Table claim but which "fall out" may still remain viable as a causation claim – and in such circumstances the usual considerations applicable to "factor unrelated" alternative causes, and the shifted burden considerations, will come into play. For present purposes, what matters is that this Table element expressly requires the *petitioner* to show no other "condition or abnormality."

Petitioner asks that I ignore the medical record entries favoring an accident-related rotator cuff tear, and proposes that I afford greater weight to the later provided declarations which he characterizes as consistent with the information provided in the contemporaneously created medical records. Brief at 16-17, 19-21. However, Petitioner ignores the fact that the entries he asks me to discount are medical histories that he provided. And they were created closer in time to his pain onset, most for the purpose of obtaining treatment. The one entry not related to treatment is Petitioner's workers' compensation claim, when he attested to a shoulder injury suffered at the time of his workplace accident. *See* Ex 8 at 51.

Furthermore, the only treating physician to fully embrace Petitioner's assertion that his right shoulder symptoms were vaccine-related – the immunologist who treated him in October 2019, almost two years post-vaccination - specifically stated that he had not reviewed any medical records. Ex. 10 at 15. Given the lack of an appropriate factual basis, the immunologist's opinion should be afforded little probative weight.

Still, it is important to note that Petitioner's shoulder-related expenses appear to have been paid pursuant to his workers' compensation claim. *See* Ex. 13 at 7-11; Ex. 6 at 18; Ex. 25 at 9. Although this fact would not delineate between either potential cause, it does show that Petitioner's employer accepted that his shoulder injury was related to one or both events. And it means Petitioner is unlikely to have substantial out-of-pocket treatment costs.

Because both potential causes occurred on November 7, 2017, it will be difficult to distinguish their respective impacts or relative importance in causing Petitioner's shoulder injury. Petitioner argues that his delayed pain onset supports a causal link with the vaccine, rather than the accident, but does not provide additional details or evidence to support this assertion. Yet in the Vaccine Program, petitioners suffering vaccine-related shoulder injuries often report immediate pain. Thus, the delayed manifestation of Petitioner's pain may portend a more likely causal link with a rotator cuff injury sustained during the workplace accident, although expert testimony on the issue will no doubt be needed.

Even if it is determined that Petitioner suffered a workplace injury that caused his right shoulder pain, it would be difficult for Respondent to establish the Tdap vaccine had *no* effect or relevance. To successfully show he is entitled to compensation, Petitioner need only establish a *prima facie* case related to causation. *See, Walther v. Sec'y of Health & Hum. Servs.,* 485 F.3d 1146, 1151 (Fed. Cir 2007). The burden of proof would then shift to Respondent to provide preponderant proof of an alternative cause unrelated

to vaccination. Section 13(a)(1)(B). And a vaccine need only be a substantial factor in causing an injury.

I note at the same time that the pain severity that Petitioner reported throughout his treatment was milder than what he alleges in his declarations and briefing,[24] and the evidence related to unrelated co-morbidities is persuasive.[25] Furthermore, there are clear instances when Petitioner assumed a greater impairment that his treaters. *See,* e.g., Ex. 16 at 73. At a minimum, these factors will impact any pain and suffering amount, dictating an award that may not be as great as Petitioner expects.

Given the costs associated with continued litigation which are likely to be significant, I am encouraging the parties to attempt one more time to reach an informal settlement.  Otherwise, formal resolution of Petitioner's non-Table claim will likely require further review and most likely the retention of experts outside of SPU. The Petition will be transferred if the parties cannot capitalize on this last chance at a settlement in SPU.

## Conclusion

Petitioner has established the pain onset required for a Table SIRVA, but has failed to satisfy other Table elements – specifically the absence of an alternative cause that would explain his symptoms. **Accordingly, his Table SIRVA claim is dismissed.**

Given the additional time and costs associated with continued litigation, coupled with the likelihood that Petitioner may prevail but may not receive the amount of compensation he envisions, a renewal of the parties' settlement discussions is warranted. Thus, the parties should make one more attempt to reach an informal settlement in this case, before I reassign it out of SPU.

---

[24] The right shoulder pain levels reported by Petitioner varied between one to five, with five proposed as a maximum amount. *See,* e.g., Ex. 6 at 30 (reporting a pain level of two on March 26, 2018); Ex. 7 at 207 (reporting pain levels ranging from three to five on May 7, 2018); Ex. 6 at 11, 9 (a pain level of two on August 13, 2018, and three on August 26, 2018); Ex. 7 at 154 (pain levels ranging from two to three on September 13, 2018); Ex. 6 at 6 (a pain level of four on October 15, 2018); Ex. 17 at 4 (a pain level of one on September 14, 2020).

[25] Prior to vaccination, Petitioner suffered from pain in multiple locations, including the midline lower back, neck, right sciatic, right hip pain, elbows, wrists, and hands. Ex. 2; Ex. 8 at 166. And he continued to experience pain in his lower back and legs, as well as carpal tunnel syndrome and ulnar neuropathy, concurrently with his right shoulder pain. Ex. 2 at 12; Ex. 18 at 8-9, 13-27, 31-45.

The parties shall file a joint status report indicating whether they believe an informal settlement could be reached in this case and updating me on their current efforts by no later than <u>Wednesday, January 21, 2026</u>.

IT IS SO ORDERED.

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master